## RAY v. LISCHY *et al.*

*Appeal from Polk District Court — Monday, December* 19.

SUFFICIENCY OF EVIDENCE TO SHOW FRAUD AND NOTICE THEREOF.

THE opinion of the court was announced by —

LOWE, J. — On the 10th of September, 1860, plaintiff, in an attachment suit, recovered a judgment of $443.04 against the defendant, John Lischy, on a claim of indebtedness, dating back, perhaps, to the summer of 1857. To satisfy this judgment, an execution was sued out and levied upon certain lands of the defendant, sold and purchased at sheriff's sale by the plaintiff, who files this bill to quiet his title and

remove a cloud therefrom, occasioned by the fraudulent conduct of the defendants. The substance of this charge is this: That prior to the 28th of August, 1858, the defendant, John Lischy, was the owner of some five or six hundred acres of land in Polk county, Iowa; that he became embarrassed and in failing circumstances, and for the purpose of placing his property beyond the reach of his creditors, among whom at that time was the plaintiff, he conveyed all his real estate at that date to Noah Lischy, a younger brother and a non-resident, for the alleged sum of $9,000.00. Some eight or nine months after this, Noah executed and acknowledged some four or five deeds for the same land, for a consideration expressed therein of $9,500.00, leaving the name of the grantee therein blank. These deeds were placed in the hands of John, who commenced trading on the same, filling up the blanks in the deeds with the name of the purchaser, whenever he effected a sale. In the meantime, two attachment suits were instituted against John Lischy, in which these lands were seized and levied upon. The first, in favor Burrows & Hitchcock, who obtained their judgment in September, 1859, and on which they sold said land the November following. The second attachment suit was in favor of the plaintiff in this proceeding, who, as before stated, obtained his judgment in September, 1860. At the end of nine months, he redeemed the property from the sale under the Burrows & Hitchcock judgment, and took an assignment of the certificate of purchase. On the 2d of November, 1860, John Lischy sold said lands to the defendant Spofford, filling out one of the blank deeds with his name. Three days thereafter, the land sold under the Burrows & Hitchcock judgment, previously redeemed by plaintiff, was again redeemed in John Lischy's name, by himself or by Spofford, the purchaser under him. Now the plaintiff, under his attachment and judgment, which were levied and obtained long anterior to the purchase by Spofford of these lands, took his deed from the sheriff, and files this bill to set aside the deed from John to Noah Lischy, and to quiet his title, alleging that said sale and conveyance was merely colorable and fraudulent as against creditors. That it was so from the evidence, there can be no manner of doubt; indeed, this question is not seriously controverted; but it is claimed that the defendant Spofford had no notice of this fact, at the time of his purchase; and this is the only objection in the way of the relief which the plaintiff asks. That there is no direct proof of such notice is conceded; nevertheless, we cannot but think that the surroundings of the contracting parties were such as should have put any prudent, cautious purchaser upon his guard and upon inquiry. It is not needful, perhaps, to mention more than a few circumstances: Spofford, in his deposition, admits that when he purchased he knew of the Burrows & Hitchcock

attachment and judgment against John Lischy, and that he paid the same off. But it is asked, why? Upon the hypothesis that the conveyance from John to Noah Lischy was a *bona fide* transaction, there was no legal necessity for him to have done so, for the reason he was purchasing of Noah, whose deed antedated the attachment aforesaid. This act can only be explained, reasonably, upon the theory that it was done out of abundance of caution, lest all was not right in the conveyance of John to Noah of these lands. But Spofford, in going to the clerk's office (which he did in person) to pay off the Burrows & Hitchcock judgment, paid the money in fact for the benefit of the plaintiff in this case, who was a junior attachment and judgment creditor, and as such had himself redeemed the land from sale under the Burrows & Hitchcock judgment, all which the same record showed, and which we think a cautious man or purchaser would have observed.

Again, one acre and a half of these lands was situated in Des Moines, which John sold for a horse. This horse was kept and cared for in Spofford's stable, and John Lischy was or had been boarding with Spofford. The plaintiff, in attaching the lands in dispute, also attached this horse, and afterward John Lischy consented that the horse might be taken by the plaintiff and credited on his claim, a circumstance coming to the knowledge of Spofford which was calculated to awaken suspicion, that the sale of the lands from John to Noah was only colorable and not a real transaction. Then again, the fact that John Lischy sold these lands to Spofford for less than one-fourth of the consideration named in the deed, taking in pay therefor the boarding bill which he owed Spofford, and an outfit in the way of horses and a wagon and buggy, for his own use, to take him to Pike's Peak, of all which Spofford was not ignorant, are circumstances tending to impeach the *bona fides* of the conveyance of these lands to Noah Lischy, and should have induced a prudent purchaser to have scrutinized the title of the property with care. But additionally to all this, it is insisted that Spofford's deed, with the name of the grantee blank, had been in the possession of John Lischy some eighteen months after the execution and acknowledgment thereof by Noah Lischy, and that the insertion of Spofford's name as grantee at so late a period after its execution, was such a change or alteration in the instrument, as vitiated it as a conveyance, and rendered it void in the hands of Spofford, unless it had been re-executed and acknowledged at the time of the sale and purchase of the land. This, as a proposition of law, derives no little support from the books. See 2 Parsons, 110, 230; *Marshall* v. *Houghton*, Sargeant & Rawle, 165; 4 Binney, p. 1. Still it is an important question which comes up incidentally in this case, and we prefer not

to pass upon it until it is directly made, especially as we find enough in the record and evidence to satisfy the entire court, that Spofford was so far charged with the fraudulent character of the deed from John to Noah Lischy, and the existence of plaintiff's attachment, as to make it their duty to affirm the judgment below, which is accordingly done.

Affirmed.

# II. MEMORIAL.

Supreme Court Room, Des Moines,<br>
December 20th, 1864.

The court met pursuant to adjournment.

JEFFERSON S. POLK adddressed the court as follows:

MAY IT PLEASE THE COURT: It becomes my sad and painful duty to announce to this court the death of General SAMUEL A. RICE, a member of this bar. He died at his residence in Oskaloosa, on the 6th day of July, 1864, of wounds received at the battle of Jenkins' Ferry, while nobly and gallantly leading his brigade. I have been directed by my brother members of this bar, in a meeting assembled here on yesterday, to present for your consideration the following

### RESOLUTIONS:

WHEREAS, General SAMUEL A. RICE, formerly a member of the bar of this court, and for four years Attorney-General of the State, died at his home in Oskaloosa, on the 6th day of July, 1864, from a wound received in battle at Jenkins' Ferry on the 30th day of April, 1864; and whereas, the high standing of the deceased as a member of the profession, as well as his exalted patriotism and many personal virtues, demand a special notice of his memory upon our part; therefore, be it

*Resolved,* By the members of the bar now in attendance upon the Supreme Court:

1. That we deeply deplore this dispensation of Divine Providence, in thus removing from our midst one who adorned his profession, and endeared himself to us by his uniform courtesy and upright conduct.

2. That by his death, a brave and true soldier and officer has fallen in defense of his government, a kind father and true husband has been